**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Case No.: CCB-21-0107** |
| **SAURABH CHAWLA** | * | |
| **Defendant** | * | |

*   *   *   *   *   *   *   *   *   *   *   *

**SENTENCING MEMORANDUM ON BEHALF OF SAURABH CHAWLA**

August 27, 2021


G. Adam Ruther (Fed. Bar No. 30183)
ROSENBERG MARTIN GREENBERG, LLP
25 South Charles Street, 21st Floor
Baltimore, Maryland 21201
P: (410) 727-6677
F: (410) 727-1115
aruther@rosenbergmartin.com

*Counsel for Defendant, Saurabh Chawla*

# TABLE OF CONTENTS

INTRODUCTION .......... 3

ARGUMENT .......... 5

A. Sentencing Procedures .......... 5

B. The § 3553(a) Factors Support Downward Variance .......... 6

1. The Nature of the Offense .......... 7

2. The History and Characteristics of the Defendant .......... 12

3. The Purpose of Sentencing .......... 17

4. The Kinds of Sentences Available .......... 19

5. The Need to Avoid Unwarranted Disparities Among Similar Offenders .......... 20

6. The Need to Provide Restitution to Any Victims of the Offense .......... 22

CONCLUSION .......... 23

Defendant, Saurabh Chawla, by his undersigned counsel, submits the following Sentencing Memorandum to assist the court in determining a sentence "sufficient, but not greater than necessary," to accomplish the purposes of sentencing. 18 U.S.C. § 3553(a). As demonstrated more fully below, in light of the nature of the offense, the significant collateral consequences of the offense, and Mr. Chawla's very low risk of recidivism, a sentence below the sentencing guidelines would satisfy this purpose and give appropriate weight to the relevant sentencing factors in 18 U.S.C. § 3553.

## INTRODUCTION

On May 19, 2021, Mr. Chawla appeared before Your Honor and entered a plea to the three-count information charging him with Conspiracy, under 18 U.S.C. § 371; Interstate Transportation of Stolen Property, under 18 U.S.C. § 2314; and Tax Evasion, under 26 U.S.C. § 7201. These charges were in connection with Mr. Chawla's purchasing and selling goods that Mr. Chawla knew or should have known were stolen through eBay accounts that he controlled. A Presentence Investigation Report was ordered and is complete. Sentencing is set for September 10, 2021.

According to the stipulated statement of facts in the plea agreements, between 2009 and 2019, Mr. Chawla bought stolen goods from a number of individuals and sold those items on eBay and through other means for a profit.

As described in the Presentence Report ("PSR"), Mr. Chawla's advisory sentencing range is 87 to 108 months.[1] This severe recommendation is the result of the Federal Sentencing

[1] This Guidelines range presumes that the Court will impose a 2-point increase for the offense involving receiving stolen property and the defendant being a person in the business of receiving and selling stolen property under USSG § 2B1.1(b)(4). As stated in the PSR, the Government and the defense agreed that the defense would be free to argue against the application of this enhancement, and the Government would argue for its application. However, upon a careful review of the case law that discusses the application of USSG § 2B1.1(b)(4) and the stipulated facts of this case, the defense declines to argue against the application of the enhancement. Mr.

Guidelines' mathematical formula, which is based almost entirely on the amount of loss as a result of the criminal conduct. In this vein, the Guidelines make no attempt to consider the defendant's characteristics, or the goals of sentencing: to promote deterrence and rehabilitation. As explained below, Mr. Chawla has no criminal history and does not pose a risk of recidivism. He has accepted responsibility for his conduct by cooperating with the Government as best he could, and by being scrupulous about retaining assets and funds that could even arguably be connected to his crimes in anticipation of further government seizures. He has already been punished significantly through the loss of his business, the demise of his marriage, the forfeiture of virtually all of his remaining assets, and the strong likelihood that he will miss a significant part of his young daughter's life. Mr. Chawla should not be incarcerated for so long (7.25 to 9 years) almost exclusively because of the amount of loss – to do so would pervert the goals of sentencing and would inappropriately base what should be critical case specific determinations on a one-size-fits-all quantitative formula.

Mr. Chawla respectfully requests the Court judge him on his own merits and mistakes, and view this case on its own facts to impose a sentence commensurate with both, rather than a sentence in lockstep with the inflexible rubric of the guidelines, which focus only on the mathematical aspects of his case. A sentence far below the guidelines range would be more than "sufficient, but not greater than necessary," to accomplish the purposes of sentencing. 18 U.S.C. § 3553(a). Furthermore, it will allow Mr. Chawla the best opportunity to eventually get back on his feet and make good faith efforts to pay his other debts to society, including restitution, support his daughter, and pay his tax debt to the United States.

## ARGUMENT

---

Chawla takes responsibility for his actions and does not wish to spend this Court's valuable time debating this nuance of the Guidelines, when the law would not clearly support his arguments.

The Plea Agreement in this case makes no reference to what sentence will be recommended to this Court by the Government. While there is no agreement on what sentence this Court should impose, the parties agree that the advisory guideline range is 87 to 108 months. However, the defense respectfully suggests that the guidelines are unduly severe in light of the totality of the circumstances in this case and requests a significant downward departure from the Guidelines range is warranted based on the specific facts of this case. In support of this request, the Defense makes the following argument.

**A. <u>SENTENCING PROCEDURE</u>.**

Calculation of the correct offense level under the Sentencing Guidelines is the starting point in any federal sentencing. After establishing the proper offense level and giving the government and the defense the opportunity to argue for the sentence they believe to be appropriate, the court must consider each of the § 3553(a) factors and "tailor the sentence" to fit the circumstances of the case. *United States v. Booker*, 543 U.S. 220, 245 (2005); *see also United States v. Herrera-Zuniga*, 571 F.3d 568, 581 (6th Cir. 2009); *United States v. Keller*, 498 F.3d 316, 322-23 (6th Cir. 2007); *United States v. Smith*, 566 F.3d 410, 414 (4th Cir. 2009); *United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007). Each sentence should be tailored based on "an individualized assessment based on facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). Furthermore, "extraordinary circumstances" are not required to justify a sentence outside of the Guidelines range. *Id.* at 47.

A district court may reject a sentence within the advisory Guidelines range because the case at hand falls outside the "heartland" to which the individual Guidelines apply or because a sentence within the Guidelines fails to reflect the other § 3553(a) factors or because the case warrants a different sentence regardless. *United States v. Evans*, 526 F.3d 155, 161 (4th Cir. 2008)

(internal punctuation and citation omitted); *see also United States v. O'Georgia*, 569 F.3d 281, 289 (6th Cir. 2009); *United States v. Erpenbeck*, 532 F.3d 423, 440 (6th Cir. 2008). In fact, a sentencing judge may "vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines." *Id*. (*citing Kimbrough v. United States*, 552 U.S. 85, 101 (2007)).

This approach has been adopted by the U.S. Sentencing Commission in the amendments to the Guidelines. U.S.S.G. § 1B1.1 recommends that the district courts use a three-step approach to sentencing: (1) properly calculate the advisory Guidelines range; (2) refer to the Guidelines and consider whether the case warrants any departures; and (3) consider the factors under § 3553(a) as a whole to determine if a variance is appropriate. The § 3553(a) factors include:

(1) the nature of the offense and history and characteristics of the defendant;
(2) the purpose of sentencing;
(3) the kinds of sentences available;
(4) the Sentencing Guidelines;
(5) the policy statements issued by the Sentencing Commission;
(6) the need to avoid unwarranted disparities among similar offenders; and
(7) the need to provide restitution to any victims of the offense.

In this case, the factors counsel in favor of a variance sentence. We address the relevant factors in turn.

**B. <u>The § 3553(a) FACTORS SUPPORTING DOWNWARD VARIANCE</u>.**

Without minimizing the wrongfulness of Mr. Chawla's conduct, it must be considered that the defendant is deeply remorseful and has made good faith efforts to cooperate with the Government in any way he could, including preserving assets in anticipation of further forfeiture action by the Government. Furthermore, Mr. Chawla's personal story and the story of how he came to be before the Court illustrate that he is not a hardened criminal or devious mastermind who must be removed from society for years in order to rehabilitate him and protect the public.

Rather he is a fundamentally good person, who made a series of bad decisions and gave into self-delusion and weakness in the name of his entrepreneurial ambition. The combination of these factors makes it appropriate and just to vary considerably from the Guidelines range in order to come up with a sentence sufficient, but not greater than necessary, to adequately reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes. *See* 18 U.S.C. § 3553(a)(2).

**1. Nature of Offense.**

The nature and circumstances of this particular offense do not call for a Guidelines sentence.

**Guidelines Calculations for Economic Crimes.**

In *Kimbrough*, the Supreme Court held that courts may vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines. 552 U.S. at 101. Whether a court may draw any useful advice from the Guidelines depends first on whether the United States Sentencing Commission, in promulgating or amending that Guideline, acted in the "exercise of its characteristic institutional role." *Id.* at 109. As described in *Rita v. United States*, 551 U.S. 338, 348-50 (2007), the exercise of this institutional role has two basic components: (1) reliance on empirical evidence of pre-Guidelines sentencing practice, and (2) review and revision in light of judicial decisions, sentencing data, and consultation with participants in, and experts on, the criminal justice system. Where a Guideline has not been developed based on this "empirical data and national experience," it is not an abuse of discretion to conclude that it "yields a sentence greater than necessary to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 552 U.S. at 109-10.

The movement in the Guidelines, without any empirical backing, is staggering. For example, in 1987, even the most "severe" fraud offenses (those involving loss of more than $5 million) only had a Guidelines range of 30-37 months. *See* U.S.S.G. § 2B1.1 (1987). This original range was explained by the Commission: "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these [white-collar] crimes, particularly when compared with the status quo where probation, not prison, is the norm." U.S.S.G., ch. 1, intro., pt. 4(d) (1987); *see also* U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 56 (2004) (Commission sought to ensure that white collar offenders faced "short but definite period[s] of confinement"). However, without further analysis to support current Guidelines, the same offender, at the top of the guidelines for a fraud-related offense, who would have faced an advisory range of 30-37 months in 1987 would now be facing an advisory range in excess of 20 years – all at the behest of Congressional pressures and without empirical evidence.

It is no secret that the theft guidelines applicable here have crept upward almost since their inception in 1987. In fact, if Mr. Chawla's offense was applied to the 1987 guidelines, the suggested sentence range would have been 33-41 months,[2] rather than the 87 to 108 months the Guidelines suggest today. There is no empirical data or other information justifying this upward trend for theft cases. A variance is further justified in light of this fact.

[2] Under the 1987 Guidelines, the base offense level for receiving stolen goods was 4. *See* U.S.S.G. § 2B1.2 (1987). Four points would be added for Mr. Chawla being in the business of dealing in stolen goods, which he contests. And a further 2 levels would have been added for more than minimal planning involved. For a loss of $2,000,000 to $5,000,000, the offense level would be increased by 12, totaling 22. U.S.S.G. § 2B1.1 (1987). Finally, under U.S.S.G. § 3E1.1, acceptance of responsibility would have reduced the offense level by 2 levels. For a criminal history category of I, the sentencing table would yield a guidelines range of 33-41 months, based on an offense level of 20.

There is little rational explanation for this discrepancy, other than that fraud and theft-related cases are disproportionately burdened by these sometimes arbitrary "loss" determinations. In other economic offenses involving tax, bribery, and antitrust violations, average sentences are 16 months, 18 months, and 14 months, respectively – all significantly lower than fraud offenses because of these loss calculations. *Id.* As noted by Professor Kate Stith of Yale Law School, where fraud might produce a sentence of 30-37 months in 1987, by 2003, the same defendant would have faced a Guidelines sentence of 151-188 months, a more than 500% increase. *See* KATE STITH, FEDERAL SENTENCING: THE ONE-WAY RATCHET, New York City Bar Association First Annual Conference on White Collar Crime (May 2012). The escalation of sentences involving fraud and theft offenses, primarily due to increased calculations of loss, does little to affect the purpose of the Guidelines or to reflect the nature of the underlying offenses.

Courts have begun to recognize that upward guideline creep in these kinds of cases can produce bad results. *See United States v. Parris*, 573 F. Supp. 2d. 744, 754 (E.D.N.Y. 2008) (Block, J.) (varying downward from range of 360-Life to 60 months and noting that the Sentencing Guidelines for white-collar crime [can produce] a "black stain on common sense"); *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (Rakoff, J.), *aff'd* 301 Fed. Appx 93 (2d Cir. 2008) (varying downward from an advisory sentence of life imprisonment to 42 months, followed by supervised release and restitution, lamenting "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"); *United States v. Lenagh*, 2009 WL 296999, *3-4, 6 (D. Neb. Fed. 6, 2009) (imposing below Guidelines sentence for conspiracy to commit health care fraud "because the fraud offense Guidelines were promulgated by Congressional directive rather than by application of the Sentencing

Commission's unique area of expertise, [so] the court affords them less deference than it would to empirically-grounded Guidelines"). In this area, the Guidelines calculation is driven by the amount of loss. Although, as a general rule, the amount of loss or damage is one measure of the seriousness of an offense, and should determine the amount of restitution, it is not a reliable proxy for the culpability of an individual defendant – this is made clear through these recent sentencing decisions.

In addition to this upward creep, in the view of some, the fraud and theft guidelines have become draconian and irrational. This was highlighted by Judge Rakoff in *United States v. Gupta*,:

> Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.
>
> * * * * * * * * * * *
>
> Here, as [in the context of the narcotics, where a 100-to-1 ratio was adopted for crack cocaine offenses], the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology – thus maximizing the risk of injustice.

No. 1:11-CR-907 (S.D.N.Y., Nov. 9, 2012). In that case, where the Guidelines yielded a range of 78 to 97 months imprisonment, Judge Rakoff sentenced the defendant to 24 months imprisonment, based on the above factors.

Judge Rakoff is not alone in this regard. As stated by Judge Bright, "[t]he fraud guidelines have been heavily criticized because they no longer provide a reasonable starting point for sentencing." *U.S. v. Spencer*, No. 11-3463 (8th Cir. 2012) (Bright, J. dissenting) (expressing dissatisfaction with impact of guidelines on sentence, where defendant received 125 month

sentence and guidelines called for 262 to 327 months). Furthermore, "[a]djustments based on the amount of loss lead to astronomical sentences that have little connection to criminality." *Id.* (citing Frank O. Bowman, III, *Nothing is Not Enough: Fix the Absurd Post-Booker Federal Sentencing* System, 24 Fed. Sent'g Rep. 356, 360). This harsh range is a direct result of the Guidelines over-emphasis on the amount of the loss as the single most important factor. *See* Alan Ellis et al., *At a "Loss" for Justice – Federal Sentencing for Economic Offenses*, 25 A.B.A. Crim. Just. 34, 35 (Winter 2011).

Other courts have considered whether the fraud and theft guidelines set forth an appropriate sentence in particular cases. For example, in the District of Massachusetts, *United States v. Watt*, 707 F. Supp.2d 149, 155 (D.Mass. 2010), the Court stated the following:

> Loss under the Guidelines is effectively a proxy for evaluating culpability. Sometimes, it is appropriate, and sometimes it is not. For example, at one point, the background note to USSG Section 2B1.1 suggested that the Guideline drafters believed loss was an appropriate proxy because it reflected both "harm to the victim" and "gain to the defendant." . . ., that was not so here; Watt made nothing from the scheme. (footnote omitted).

The court's decision in *United States v. Costello*, 16 F. Supp. 2d 36, 37 (D Mass. 1998), cited in the *Watt* case, is also instructive. There, the court departed downward six points in sentencing two defendants charged with conspiring to steal computer disks, compact disks and computer software from their employer. *See id.* at 40. After an evidentiary hearing, the Court found that the amount of loss was in excess of $20 million. The Judge determined, however, that the defendants received at most one percent of the value of the goods, whereas a third conspirator had organized the theft and taken the major part of the proceeds. *See id* at 39. Recognizing that under such circumstances, the amount of loss was not, as the Guidelines assume, an appropriate proxy for culpability, the Court departed downward by six levels.

As other courts have recognized, loss calculations can "overstate both the degree of [a defendant's] criminality and his need to be corrected." *United States v. Stuart*, 22 F.3d 76, 82 (3d Cir. 1994). S*ee also United States v. Emmeneger,* in which the court stated:

> The Guidelines place undue weight on the amount of loss involved in the fraud. This is certainly a relevant sentencing factor: All else being equal, large thefts damage society more than small ones, create a greater temptation for potential offenders, and thus generally require greater deterrence and more serious punishment. But the guidelines provisions for theft and fraud place excessive weight on this single factor, attempting – no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes – to assign precise weights to the theft of different dollar amounts. In many cases, including this one the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence.

329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004)

Mr. Chawla's case, like the *Stuart* and *Emmenegger* cases, is a situation where the amount of loss is a poor indicator of his actual criminality and the need for punishment and deterrence. The guideline calculation here, when all the factors have been considered, is an Offense Level of 29 (or 27 depending on the disputed enhancement), and a Criminal History Level of I, which places the recommended sentencing range for this young father at a worse case of 87 to 108 months. This advisory guidelines range is based most almost entirely on the amount of loss involved, more than $3,500,000 but less than $9,500,000 (or an additional 18 points added to the base offense score of 6).[3] The outsized and arbitrary weight that the Guidelines places on the amount of the loss produces an extreme sentencing range that is far in excess of the sentence that is truly necessary to punish Mr. Chawla and deter him and others from similar conduct.

**2. <u>The History and Characteristics of Defendant</u>.**

**Mr. Chawla's Personal and Professional History**

[3] The 18 points associated with the loss here accounts for approximately 79 months of difference in the bottom of the advisory range. That is, the base offense level plus adjustments, aside from loss value, produces a range of 8-14 months.

Saurabh Chawla was born to Sunil and Savita Chawla in New Delhi, India on January 8, 1985. Mr. Chawla came to the United States, to Ocean City, Maryland, when he was only about one month old – his parents hoping to build a better life for him than their own back in India. Mr. Chawla, his younger sister, and their parents all lived in a small apartment on top of his parents' store, India Emporium on the boardwalk in Ocean City. Their home was modest, but it had everything they could want. The building had a wraparound porch with un-obstructed views of the Atlantic Ocean where his parents hosted many out-of-town guests every year for crabs and over-the-top Indian feasts. The Original Fisher's popcorn was only 100 feet away. Mr. Chawla's childhood was, in many ways, idyllic, but it was also not without its struggles.

Like many immigrant entrepreneurs, Mr. Chawla's parents worked extremely long hours. During the summer tourist season, they would routinely work 12-14 hours a day in their store, knowing they only had four months to maximize their income. In the off-season, Mr. Chawla's father worked at a Thriftway grocery store as a deli slicer and his mother worked at Roses, a department store that still stands today on 94th Street. They worked minimum wage jobs to further provide for their family. Mr. Chawla saw his parents' drive and their entrepreneurial spirit and knew at a young age that someday he wanted to both follow their example and return the favor of what his parents did and sacrificed for him and his sister.

One of Mr. Chawla's more vivid memories of his childhood was, on his 6th birthday, receiving a brand-new Nintendo Entertainment System from his parents. He knew his parents worked extremely hard to give him that gift, and he remembered getting a new video game almost every week knowing that each one costed $50, which was a considerable sum. As it happens, that gift sparked a lifelong passion for computers and technology for Mr. Chawla, which would inspire many of his entrepreneurial endeavors as an adult.

Another driver for Mr. Chawla's passion for technology came from his elementary school, Ocean City Elementary, which had Apple II computers in its computer lab. Mr. Chawla loved lab time and playing Oregon Trail. Mr. Chawla built his first computer at the age of 10. And he started his e-commerce business selling electronics partially because he saw how the Apple iPod was going to be one of the most important innovations in technology in his lifetime.

Mr. Chawla's parents, while generous, loving, and caring, were also quite strict, and expected their children to work and study hard. Mr. Chawla and his sister were restricted from participating in many common social activities, so as to shield them from many of the impurities of our world. Unfortunately, this caused Mr. Chawla and his sister to be more sheltered than most children and that certainly had psychological effects, making him overly trusting and somewhat naïve.

Although Mr. Chawla's family had what they needed, they were not affluent, and Mr. Chawla saw his parents regularly being ridiculed and made fun of by the wealthier doctors, dentists and other upper-middle class professionals they saw at Indian gatherings and parties around their community. On one occasion, Mr. Chawla remembers the son of another more affluent family not being allowed to play with him as a child because his family was not of the same class. Still, his family did they best they could. Mr. Chawla's father was known as the "coupon man" while Mr. Chawla was growing up, always finding deals to save money on groceries, toiletries, or restaurants and entertainment to make their money stretch as far as he could. The habit of being careful with money was instilled in Mr. Chawla from a young age. His parents also made it clear that in their eyes, success in life was largely measured by money, and they wanted their son to achieve more than they had. These lessons and moments were catalysts for Mr. Chawla's desire to create a better

life for his family. But the blind ambition Mr. Chawla developed as a result of what he saw growing up and his thirst for a better life also contributed to him losing his way.

In 1992, Mr. Chawla's father met a sterling silver manufacturer, designer, and wholesaler named Peter Koslowski. Mr. Chawla's father was originally buying wholesale from Koslowski for the India Emporium store and Koslowski was interested in opening an office and having a stronger presence in the United States. Mr. Chawla's father and Koslowski decided to work together, and they started a company out of the family's living room. Mr. Chawla witnessed the growth of that company, eventually moving into a larger office space in Selbyville, Delaware.

With Mr. Chawla's father's role in the new company, their financial situation changed significantly. His parents were able to start saving money and take vacations to places like Disney World, Canada, London, and India. What is more, the family finally felt some relief from their tireless efforts to make ends meet. This model of successful entrepreneurship instilled a strong desire in Mr. Chawla to start and grow his own business when he grew up.

Mr. Chawla's entrepreneurial experience started with helping to create an online presence for the family's store. He initially started selling Buffalo Sandals (the "hippie sandals" worn during the 60s and 70s) from his parent's store on eBay. Mr. Chawla sold over 10,000 pairs of these sandals in over 60 countries. He also created India-Emporium.com, which became a successful e-commerce website selling other popular items from the family's store. Mr. Chawla took on these projects to develop the skills he needed in order to do what really interested him – selling consumer electronics.

Mr. Chawla began to realize that dream when he started his own business in his final semester at Salisbury University, buying and selling products on eBay. He would seek out good deals or discounts on popular products wherever he could find them and then re-sell his inventory

through his online accounts. His business model was simple – buy low and sell high. He knew by building a business and career this way he was taking the path less traveled. But he never thought that this unorthodox path would lead him to this point, sliding down the slippery slope from entrepreneur to criminal.

Mr. Chawla enjoyed the success and freedom that his independent business afforded him. He felt empowered and proud of what he accomplished. Taking the next step in his personal life as well, he met and fell in love with the woman who would become his wife, Neha. Taking advantage of his freedom to work from anywhere, Mr. Chawla moved to Texas to be with Neha, and then they moved together to Colorado. Mr. Chawla began employing his father to run the receiving and shipping aspects of his business. As his business grew, so too did Mr. Chawla's ability to purchase inventory in bulk, and so he sought out sources of larger quantities of merchandise. In his ambition and enthusiasm to make good deals and grow his business, Mr. Chawla began to cut corners and ignore "red flags" in his product stream. As often happens when good people go down the wrong path, Mr. Chawla developed an ability or willingness to turn a blind eye, or even to delude himself into believing that he was not responsible for, or was not really participating in, things he knew were wrong.

Mr. Chawla never set out to become a dealer in stolen goods. His goal was certainly never to live a life of crime. Rather, he was slowly seduced by the success he enjoyed in his business dealings as a result of being willing to not ask questions, look the other way, or believe what he was told. If he allowed himself to develop just enough of this moral flexibility, his business could thrive in a way that was not otherwise as achievable. He could give his young family the life his parents always wanted for him – he could be a success and an example of the American dream. He made his moral and ethical compromises to succeed. He made deals he knew were too good

to be true; he overlooked indications that property he was buying was stolen – at times, telling himself it wasn't his fault or responsibility. And at times he ignored direct evidence of the nature of the goods he was selling and took steps to cover up that evidence. He sees these mistakes with crystal clarity now, and he knows and accepts that they are indeed his responsibility alone. He sees his mistakes so clearly because they have cost him almost everything he loves.

In the summer of 2019, Mr. Chawla's world began to collapse when federal agents knocked on his door early one morning. Neha was pregnant at the time with their first child. She had been completely unaware of the illegal underpinnings of much of Mr. Chawla's seemingly legitimate business and his criminal under-reporting of his income to the IRS. A few weeks after the raid on their house, and a few days after federal authorities seized most of their assets, including both of their cars, Mr. Chawla and Neha welcomed their daughter, Sonali, into the world. Sonali was born early due to Neha experiencing high blood pressure attributable to the stress she was under because of this case.

Over the course of the following two years, with the cloud of this case looming over him, Mr. Chawla's life continued to crumble around him. Ultimately, his marriage could not survive the betrayal and loss of trust that Neha felt as the result of Mr. Chawla's actions. The couple divorced in the spring of 2021, but Mr. Chawla still gets to spend time with Sonali, and he and Neha co-parent together well. Mr. Chawla truly had everything, and he knows he has lost, or will lose, all of it because of what he has done.

**3. The Purpose of Sentencing**.

As noted, each sentence imposed should be determined based on the relevant facts and circumstances and designed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). Here, a sentence far below the Guidelines, when combined with the restitution and forfeiture orders that will be entered, would be sufficient, but not greater than necessary, to accomplish these objectives. Indeed, the Guidelines range overshoots the mark of all of these considerations by a significant margin.

Even the low end of the Guidelines, 87 months of imprisonment, is not necessary in this case to "reflect the seriousness of the offense" or "to promote respect for the law." *See* 18 U.S.C. § 3553(a)(2)(A). These charges themselves, and their collateral consequences do enough to convey the seriousness of this offense and provide sufficient punishment for Mr. Chawla. He has lost virtually everything he has ever worked for and loved. Moreover, Mr. Chawla has accepted complete responsibility for his conduct, confirming his respect for the law, the Government, and this Court.

As to general deterrence, the Government action already taken in this case, which will strip Mr. Chawla of almost everything he has, sends a clear message that this sort of crime will not be tolerated. No one who hears Mr. Chawla's story and sees his life after this prosecution will ever consider committing such a crime, thinking they will get away with it or that the punishment associated with it would be inconsequential. This case sends a clear message that there is a significant price to pay for the commission of such crimes.

On a personal level, Mr. Chawla has brought dishonor and embarrassment upon himself and the family he loves. His family and friends all recognize the severity of his situation. What is more, he has lost the respect and partnership of his wife, on whose companionship and help he would have relied heavily during this regrettable and most difficult chapter of his life. Knowing

that the Court will impose some sentence of incarceration, Mr. Chawla also knows that he will lose priceless time as a father, watching his little girl grow up. Even if the Court imposes a sentence far below the Guidelines, Mr. Chawla will miss what most parents would say are some of the most beautiful and important years of his daughter's development. And his daughter will miss him. In light of the totality of the consequences Mr. Chawla has suffered as a result of his crimes, a sentence far below the Guidelines recommendation would send a sufficiently strong message to serve the purpose of encouraging others to obey and respect the law.

Finally, incarceration is not necessary at all to provide Mr. Chawla with "needed educational or vocational training, medical care, or other correctional treatment." *See* 18 U.S.C. § 3553(a)(2)(D). Mr. Chawla has a college degree, and up until this point, he has been a functioning, productive member of his community. There is nothing the Bureau of Prisons can provide that will improve or enhance his current condition. *See* 18 U.S.C. §3582(a) ("imprisonment is not an appropriate means of promoting correction and rehabilitation"). Mr. Chawla does intend, however, to make the best use of whatever term of incarceration the Court deems appropriate by furthering his skills and education to whatever extent he can.

**4. <u>The Kinds of Sentences Available</u>.**

This Court may exercise its discretion to consider a wide range of alternatives to additional years of imprisonment. In fact, § 3553(a)(3) specifically directs judges to consider sentences *other than* imprisonment. However, Mr. Chawla recognizes that a period of incarceration is called for and will almost certainly be imposed by this Court. He accepts this as part of accepting responsibility for his actions. But again, the interests of justice and the purposes of sentencing would be well served by a sentence of incarceration far below the inflated Guidelines range,

especially when coupled with an extended period of supervised release with conditions to include community service.

**5. Need To Avoid Unwarranted Disparities Among Similar Offenders.**

Title 18 U.S.C. §3553(a)(6) directs that the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" be considered when imposing sentence. In fact, this mandate, to avoid unwarranted sentence disparities, was the primary impetus for the creation of the Federal Sentencing Guidelines. In 1984, Congress passed the Sentencing Reform Act (SRA) in an attempt to eliminate the disparities for similarly situated offenders that had existed for the prior 50 years under the indeterminate sentencing model. The SRA created and authorized the United States Sentencing Commission to establish sentencing policies and practices that:

> [P]rovide certainty and fairness in meeting the purposes of sentencing, *avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct* while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices.

Title 28 U.S.C. §991(b)(1)(B) (emphasis added).

The fiscal year 2020 sentencing statistics compiled by the United States Sentencing Commission show that, of offenders who fall into offender category I and who were convicted of theft/fraud offenses and were sentenced to some period of incarceration, 66.9% received sentences of up to 24 months, and 23.5% of such offenders received sentences of 24 to 59 months. United States Sentencing Commission 2020 Sentencing Statistics, https://ida.ussc.gov/analytics/saw.dll?Dashboard. The statistics as a whole are depicted on the following chart:




Thus, a sentence far below the guidelines range would actually keep this case more in line with the average sentences for this type of offense and this type of offender.

Looking at more specific statistics regarding sentences coming from this District, for fraud/theft offenses, involving Criminal History Category I offenders, with Guidelines ranges in Zone D, the distribution chart looks very similar:

**Distribution of Imprisonment Length**

Fiscal Year 2020




The figure includes the 27 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure.

**FILTER:**

Fiscal Year: 2020; Circuit: All; State: Maryland; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Fraud/Theft/Embezzlement; Guideline: §2B1.1; Sentencing Zone: D; Criminal History: I

United States Sentencing Commission 2020 Sentencing Statistics, Fiscal Year 2020, https://ida.ussc.gov/analytics/saw.dll?Dashboard.

**6. Need to Provide Restitution to Any Victims of the Offense.**

Mr. Chawla is required to make restitution to the owners of the stolen property that he bought and sold. He shares this burden with the other related defendants who stole that property and sold it to him. He welcomes the opportunity to rebuild his earning potential so that he may

make progress in paying these victims back. By the same token, he is eager to be able to earn money to pay his $713,619 tax debt to the Treasury. The reality is, however, that the longer he is incarcerated, the more difficult it will be for Mr. Chawla to regain his own financial stability and work toward paying these debts.

## CONCLUSION

By making these arguments Mr. Chawla is not in any way trying to minimize the seriousness of his conduct or deny his responsibility for it. These arguments do illustrate, however, why a sentence far below the Guidelines would be "sufficient, but not greater than" necessary to adequately reflect the seriousness of his offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, and to protect the public from other crimes.

Respectfully submitted,

/s/

G. Adam Ruther (Fed. Bar No.30183)
ROSENBERG MARTIN GREENBERG, LLP
25 South Charles Street, 21st Floor
Baltimore, Maryland 21201
(410) 727-6600
(410) 727-1115

*Counsel for Defendant, Saurabh Chawla*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing Sentencing Memorandum was served upon all counsel of record on August 27, 2021 via ECF filing:

*/s/*

G. Adam Ruther

4848-6849-1496, v. 1