IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. CCB-21-107 |
| SAURABH CHAWLA, | : | |
| Defendant. | : | |

...oooOooo...

# GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its counsel, Jonathan F. Lenzner, Acting United States Attorney for the District of Maryland, and Harry M. Gruber and Paul Riley, Assistant United States Attorneys for said District, hereby submits its Sentencing Memorandum in the above-captioned case.

The government respectfully requests that this Court sentence the defendant to 84 months' incarceration, followed by three years of supervised release, and a special assessment of $100. The government submits that this is a reasonable and necessary sentence, pursuant to the sentencing factors articulated in 18 U.S.C. § 3553(a). Chawla's criminal conduct was extensive, egregious, long-lasting, financially lucrative for him, and caused substantial financial harm. The requested sentence is warranted due to the serious nature of Chawla's many offenses, and the need to punish Chawla, deter future conduct by Chawla and others, and promote respect for the law.

<u>Factual Summary</u>

The defendant pled guilty to three criminal offenses: (i) a conspiracy to commit wire fraud and interstate transportation of stolen goods; (ii) interstate transportation of stolen goods; and (iii) tax evasion. These are serious criminal offenses that warrant a significant term of incarceration.

1

Moreover, the essentially undisputed facts[1] demonstrate that Saurabh Chawla's offenses involved a sophisticated conspiracy and scheme to defraud and engage in the interstate transportation of stolen goods that lasted for approximately 10 years and resulted in more than $3.5 million in actual losses.

Unlike some fraud and interstate transportation cases likely handled by this Court, the conspiracy to defraud and engage in interstate transportation of stolen goods was essentially undetected—despite the large losses involved—because Chawla primarily purchased the items from individuals with "insider" access to the goods and merchandise, such that they could steal the items and sell them to Chawla without detection.

His crimes resulted in harm to numerous individuals and businesses throughout the United States, financial harms that went back so far in time that many victims could not be contacted by the government, and for those companies that the government was able to contact/received a response, insufficient records often existed for victims to determine the full financial harm they suffered. Nevertheless, through good investigation, federal agents were able to determine, and Chawla has now stipulated, that for almost a full decade (2009-2019), Chawla purchased extensive quantities of stolen goods (over $3.5 million) from two particular individuals, defendants Kristy Stock and Joseph Kukta. *See United States v. Stock*, Crim. No. CCB-19-309; *United States v. Kukta*, Crim. No. CCB-19-614.[2]

---

[1] The parties agreed to an extensive written factual stipulation as part of the defendant's guilty plea.

[2] The government has evidence that Chawla purchased stolen goods and merchandise from other individuals beyond Stock and Kukta, including one person who was prosecuted in another federal district, but has determined that the additional stolen items would not result in a loss amount exceeding the next guidelines loss threshold of $9.5 million.

Chawla purchased Apple products from Stock from 2012 to 2018.[3] Stock was a public school employee in New Mexico and had access to her school district's supply of iPods intended to be used by underprivileged Native American children in New Mexico. Chawla initially purchased the Apple items from Stock on eBay, and they later dealt directly with each other, in emails, texts, and phone calls. Stock repeatedly advised Chawla of the items she had obtained, providing details such as the model, color and number of Apple products available. Chawla and Stock then negotiated a price, and Stock shipped the items to Chawla's relative on the Eastern Shore in Maryland. Chawla paid Stock through PayPal. In November 2018, Stock mentioned in a recorded phone call with Chawla how she had obtained 30 iPods from her school district's inventory. She asked if Chawla wanted all of them. Chawla answered without hesitation: "Uh, yeah, definitely."

Chawla then resold the electronics online—primarily through eBay—at significant markups. The online listings created by Chawla did not warn the online purchasers that they were purchasing stolen goods, and the prices were generally set slightly below the prices for comparable items on online marketplaces. Chawla had his relative in Maryland receive the stolen goods and ship them to the unsuspecting purchasers. Chawla ended up paying Stock more than $450,000, and reselling those items for more than $625,000, generating a significant profit.[4] ECF 8 at 16.

During the same approximate time period (2009-2019), Chawla "purchased large quantities of stolen goods and merchandise from Kukta." ECF 8 at 17. "Kukta obtained most of the goods and merchandise he sold to Saurabh from bulk purchases shipped via FedEx and intended for delivery to FedEx customers, including a Walmart Distribution Center in Smyrna,

---

[3]   As set forth in the factual stipulation, the sales occurred from 2012-2013, and then resumed from 2015 to 2018.
[4]   Some of the items from Stock were likely resold in other channels outside eBay and therefore are not reflected in the $625,000 figure.

Delaware." *Id*. Kukta was able to steal the goods in such a way that FedEx never detected the crime, and Kukta then delivered the stolen goods and merchandise to Chawla's relative in Maryland. Kukta sent Chawla "weekly lists of available goods and merchandise," and Chawla typically paid "50% of the retail price for the goods and merchandise Kukta had stolen." *Id*. Chawla knew that Kukta worked at the FedEx facility in Seaford, Delaware. ECF 8 at 17. As with Stock, Chawla "offered to sell and sold the goods and merchandise from Kukta to eBay customers at significant markups (often [a] 100% price increase)" versus the price Chawla "had paid for the products." *Id*. at 17. "In total, Saurabh paid Kukta more than $1.5 million for goods and merchandise" that Chawla resold for "more than $3 million." *Id*.

In 2019, as part of the government's covert investigation, Chawla purchased items that he believed were stolen from another school district in New Mexico. Chawla did not hesitate to go ahead with the purchases, despite having been warned in November 2018 that the iPads had been obtained by the [undercover agent's] school district with federal money. In a recorded call on March 12, 2019, the undercover agent explicitly talked about how he "had been stealing about one of these a day, these iPads," but was worried about being "caught." Chawla nevertheless proceeded to buy the stolen iPads, have them shipped to Chawla in Colorado, and resold them "online through eBay at a substantial markup." ECF 8 at 16.

Chawla knowingly resold the stolen goods and merchandise at substantial markups week after week for years. Chawla maintained extensive online listings of the available stolen goods and merchandise. To give the Court a sense for how extensive Chawla's operation was, the government has created an exhibit showing the Stock and Kukta related items that Chawla sold online through eBay in or about December 2017. *See* Exhibit 1. As Exhibit 1 shows, in December 2017 alone, Chawla sold more than 2,000 stolen items for more than $83,000.

Needless to say, none of this illegal activity would have been possible without Saurabh's arrangement with Defendant Edward Bender (*United States v. Bender*, Crim. No. CCB-20-143) and the person identified in the factual stipulation as Person A. As noted in the factual stipulation, this arrangement was necessary because eBay and Amazon had "suspended the other accounts used by Saurabh and his relatives." ECF 8 at 15. Bender received compensation of approximately $10,000 per year in return for Bender and Person A acting as a straw owners of eBay "stores" or online marketplaces used by Chawla.

Although the online marketplaces were listed in the names of Bender and Person A, Chawla logged in directly and operated the marketplaces and the linked PayPal account. In order for the scheme to work, Saurabh, Bender and Person A had to deceive online marketplaces such as Amazon and eBay about the online sales and origin of the products offered for sale to avoid detection. They also had to deceive PayPal about the substantial flow of money stemming from the online resales of stolen goods and merchandise. ECF 8 at 15.

Chawla involved other persons in his deceptions. Chawla had Kukta "create a fake invoice [with] false information about . . . the transaction and the price paid per unit." *Id*. Chawla also recruited a friend of his to help with "creat[ing] 'dummy invoices,' which Chawla then had his relative send to eBay. Saurabh directed Bender and Person A to misrepresent that Apple products had been obtained using gift cards at large retailers." *Id*.

When eBay customers complained, Chawla worked with Bender "to provide the eBay customers with false, fraudulent, and fictitious invoices, falsely showing how items sold . . . had been originally acquired." *Id*. at 16. In a January 2015 email, Chawla sent a fake invoice to Bender to support such lies about the sourcing of the offered goods, writing "Double check it, but I think it looks clean." The subject line of Chawla's email referenced a "forged invoice."

Collectively, Chawla's crimes led to more than $3.5 million in actual losses, including to (i) Stock's New Mexico school district (Central Consolidated School District); (ii) Walmart; (iii) Nite Ize Inc.; (iv) Nike, Inc.; (v) FedEx; and (vi) numerous other producers and distributors (some small and some large corporations) throughout the United States. ECF 8 at 16. And Chawla actually "obtain[ed] more than $3.5 million from online sales of stolen goods and merchandise." *Id*. As an indication of how lucrative Chawla's crimes were for him personally—unlike in most cases this Court handles—the government seized almost $2 million in liquid assets from Chawla when it executed search and seizure warrants in this case. ECF 8 at 8. In addition to these assets, Chawla owned an expensive Colorado home and luxury vehicles. *Id*.

Chawla failed to declare millions in income during the years in question, and engaged in affirmative acts to conceal his income, resulting in the tax evasion charge and a sizeable tax loss to the United States. As noted in the factual stipulation, Chawla's tax offenses involved "the 2009-2017 tax years." ECF 8 at 17. Chawla fraudulently inflated his company's cost of goods sold,[5] thereby lowering the taxable income. For example, for the 2015, 2016, and 2017 tax years, respectively, Chawla reported taxable income of $79,593, $71,953, and $94,892, when it should have been $319,077, $278,735, and $366,813. These were large deceptions, resulting in a tax loss to the United States of more than $700,000. ECF 8 at 19.

The Advisory Sentencing Guidelines Calculation

Based on Chawla's plea agreement, the government submits that the following advisory sentencing guidelines calculations are undisputed:

- Base Offense Level = 6 (USSG § 2B1.1(a)(2))
- Adjustment based on financial loss of more than $3.5 million: +18 (USSG § 2B1.1(b)(1)(J))
- Adjustment based on 10 or more victims: +2 (USSG § 2B1.1(b)(2)(A))

---

[5]   On his tax returns, Chawla claimed to have paid substantially more for the stolen goods and merchandise than he had actually paid to Stock, Kukta, and others.

- Adjustment based on sophisticated means:  +2 (USSG § 2B1.1(b)(10)(C))
- Adjustment for being an Organizer, Leader, Manager, or Supervisor:  +2 (USSG § 3B1.1(c))

<u>USSG Section 2B1.1(B)(4) - In The Business Of Buying And Selling Stolen Property</u>

The plea agreement also contemplated a dispute between the parties regarding the two level adjustment found in USSG Section 2B1.1(b)(4), involving a determination of whether the defendant was in the business of buying and selling stolen property.

The government submits that the presentence report correctly applied this adjustment. *See* PSR, ECF 16, at ¶ 85.  As the government noted in response to the presentence report, the relevant caselaw in this Circuit strongly supports the disputed adjustment. *See United States v. White*, 77 F. App'x 678, 682 (4th Cir. 2003) (upholding application of enhancement based on proof defendant "was involved in purchasing stolen property numerous times over the course of six to eight years," bought stolen goods from "several different people," and "purposely bought items well below fair market value"); *United States v. Camara*, 908 F.3d 41, 50 (4th Cir. 2018) (purchasing two vehicles at "steep discounts" when the vehicles were worth over $250,000 and fraudulently registering them was sufficient to apply enhancement); *United States v. Delegate*, No. 1:05CR567, 2006 WL 897215, at *2 (E.D.V.A. Apr. 4, 2006) (sufficient that defendant "fraudulently procured items and sold those items to persons in Maryland").

Subsection (b)(4) has its origins in a since deleted U.S.S.G. § 2B1.2, which according to the 1987 guidelines was originally intended to punish "[p]ersons who receive stolen property for resale" as opposed to people such as Kukta and Stock, who took the property in the first instance. U.S.S.G. § 2B1.2 (1987 version).  Application Note 5 to § 2B1.1 provides additional guidance, noting that courts should consider issues such as:  "(A) The regularity and sophistication of the defendant's activities"; "(B) The value and size of the inventory of stolen goods maintained

by the defendant"; "(C) The extent to which the defendant's activities encouraged or facilitated other crimes"; and "(D) The defendant's past activities involving stolen property."

Saurabh Chawla's activities plainly meet the intent and wording of Section 2B1.1(b)(4). The factual stipulation discusses how the defendant "routinely purchased stolen goods from other individuals and businesses (including Stock and Kukta)" over a ten year period. ECF 8 at 14. The factual stipulation sets forth how the defendant resold the stolen goods through online stores and engaged in other crimes, such as the frauds on eBay and Amazon and purchasers of the goods. Saurabh's operation was extensive and involved significant sums of money and lots of items. The factual stipulation sets forth how the defendant continued to purchase and resell stolen property over time. The defendant also admitted in the factual stipulation that he purchased the stolen property at below market value and resold the stolen items for significantly more money.

Thus, the government believes the Court's guidelines calculation should include the two levels from Section 2B1.1(b)(4). The guidelines calculation proposed by the U.S. Attorney's Office and the U.S. Probation Office results in a post-acceptance adjusted final offense level of twenty-nine (29), and an advisory range of 87 to 108 months' incarceration.[6]

The Government's Sentencing Recommendation

The government's proposed term of 84 months' incarceration would constitute a reasonable sentence pursuant to 18 U.S.C. § 3553(a), and the Supreme Court's decision in *Gall v. United States*, 552 U.S. 38, 51 (2007). It is necessary based on "the nature and circumstances of the offense," "the history and characteristics of the defendant," the need to "to promote respect for the law," and the need for both specific and general deterrence. 18 U.S.C. § 3553(a).

---

[6] The government concurs that the defendant has no criminal history points.

Chawla's criminal conduct here was serious, long lasting, and harmful. For 10 years, Saurabh carried out a series of calculated lies to online marketplaces, to his customers, and to the IRS. He brought others into his wrongdoing, including his friend that helped manipulate documentation for submission to eBay and PayPal, his long-time friend from college, Defendant Edward Bender, and Person A. Chawla coached others on how to create fake documents and make false representations that benefited his scheme. At times, Chawla manipulated documents himself. Chawla caused false information to be submitted to Amazon, eBay, PayPal, and eBay customers so Chawla could continue to profit from the sale of stolen goods and merchandise. The financial loss caused by this conduct was quite large (over $3.5 million), and Saurabh enjoyed tremendous financial benefits from his crimes for almost a full decade.

Saurabh Chawla is the most culpable defendant among the many different individuals involved in these crimes. He led the operation and derived the most money from it. He stipulated in his plea that he had been a manager/supervisor role in the conspiracy, that the conspiracy and scheme to defraud had more than 10 victims, and that the conspiracy and scheme to defraud was sophisticated.

Chawla purchased millions of dollars of goods and merchandise from Kukta, who was in charge of the entire FedEx facility in Delaware. Kukta supplied these goods to Chawla and Chawla's relative on a regular basis, stealing the goods so effectively that neither FedEx nor the intended recipient of the shipped goods, Walmart, realized significant thefts had occurred until the government alerted them. Although many online purchasers of the stolen goods through eBay never realized they had been harmed by Chawla's conduct, they all paid nearly top dollar for items that were stolen, and at times the purchasers experienced issues because the products lacked valid warranties (as the product of unlawful thefts), or the products could not be installed, activated, or used correctly. The use of online marketplaces such as eBay, or the online payment processor

PayPal, which were only possible through Chawla's deceptions, substantially increased the volume of stolen goods, the financial harm, and the overall reprehensibility of Chawla's crimes.

Chawla's greed caused him to not only knowingly purchase the stolen Apple products from Stock that were intended for underprivileged children in New Mexico, but in 2019, Chawla jumped at the chance to buy stolen Apple products from the undercover agent, who posed as another corrupt government employee in New Mexico.

It is very difficult for the government to detect this type of sly, underhanded theft and resale through online entities. And after detection, it is even more difficult to prove a crime beyond a reasonable doubt. The government submits that it is important to impose a sentence commensurate with Chawla's significant criminal conduct, not only to deter Chawla and his co-conspirators, but also to deter others in the future from engaging in these kinds of organized schemes, and to promote respect for the law.

Restitution & Forfeiture

In his plea agreement, Saurabh Chawla agreed to a forfeiture of at least $3.5 million and to the forfeiture of specific assets, which had been seized by the government pursuant to seizure orders. *See* ECF 8 at 8. In a separate filing, the government is submitting a preliminary order of forfeiture for the Court's consideration in connection with these agreed upon forfeitures.

In his plea agreement, the defendant also stipulated that the Court would enter a restitution order for "the full amount of the actual losses associated with Count One, which the parties stipulate[d] and agree[d] [wa]s at least $3.5 million." ECF 8 at 9.

The government has engaged in substantial efforts to identify the individuals and companies that suffered the more than $3.5 million in actual losses so the Court could issue a restitution order. The agents have been able to calculate the losses caused by the theft of goods from the New Mexico school district. However, agents have had difficulty apportioning among

the victims the known losses ($3.5 million) stemming from the stolen goods and merchandise taken from FedEx.  Part of this is attributable to the duration of the scheme and insufficient past documentation, with most victims reporting that they only have records for the last three to five years.  Another part of the difficulty stems from the way in which Kukta stole the goods and merchandise.

As a supervisor at the FedEx facility, Kukta had after hours and weekend access.  Kukta waited to steal items until large deliveries to a Walmart distribution center were loaded onto FedEx trucks.  Thus, FedEx did not register the thefts.  When the FedEx truck arrived at the Walmart distribution center, all the contents (including the stolen goods) were marked as delivered because they were checked in shipment by shipment vs. box by box.  Although the government has evidence that Walmart at times made chargebacks to the original shippers when it later realized that certain items shown as delivered were not received, more often than not, Walmart was unaware.  And even with respect to the limited chargebacks that Walmart sought, Walmart at times absorbed the majority of the loss after the retailers showed Walmart that they had sent the goods.

Accordingly, despite its best efforts, the government has not been able to specifically apportion the known loss between Walmart and the other victims stemming from the theft of goods and merchandise from FedEx.  Based on the investigation, the government submits that Walmart likely suffered the greatest financial harm, and that its harm easily exceeded $2 million.  Nevertheless, based on its careful corporate policies, Walmart does not plan to seek restitution absent more precise tracing of its losses.  The government believes that the Court's restitution order is required to include the fraud restitution amount shown in Exhibit 2.  The government believes that Chawla should agree to pay the remaining portion of the stipulated $3.5 million in

restitution to the Crime Victims Fund. The government further requests restitution regarding the tax evasion to the IRS of $713,619.[7]

## **CONCLUSION**

Accordingly, the government respectfully requests that this Court sentence the Chawla to 84 months' incarceration, three years of supervised release, the forfeiture and restitution above, and a special assessment of $300.

Respectfully submitted,

Jonathan F. Lenzner
Acting United States Attorney

By _____/s/_____
Harry M. Gruber
Paul Riley
Assistant United States Attorneys

---

[7] The defendant stipulated to this IRS restitution in the plea agreement. ECF 8 at 10.

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing filing was served on counsel for the defendant by filing in the Court's electronic filing system and by email.

_____/s/_____
Harry M. Gruber
Assistant United States Attorney